**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MAYSOUN ABUDAYYEH, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | No. 20-cv-00142 |
| v. | ) ) | Judge Andrea R. Wood |
| ENVOY AIR, INC., | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Maysoun Abudayyeh is a former Passenger Service Agent ("PSA") for Defendant Envoy Air, Inc. ("Envoy"), an airline operating throughout the United States. In late 2015, Envoy implemented an attendance-tracking system that required all employees to use their fingerprints or handprint to clock in and out of work. However, Abudayyeh alleges that Envoy failed to comply with the requirements set out in Illinois's Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 *et seq.*, before collecting her biometric identifiers (*i.e.*, her fingerprints and handprint). Accordingly, she has brought the present action on behalf of herself and a putative class of similarly situated Envoy employees alleging violations of the BIPA. Envoy now has filed a motion to dismiss the complaint for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) or, alternatively, pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 14.) For the reasons that follow, Envoy's motion to dismiss is granted in part and denied in part.

## BACKGROUND

The following facts are taken from the complaint as well as the declaration and exhibits Envoy submitted in connection with its motion to dismiss, which are properly considered in

connection with Envoy's factual challenge to this Court's subject-matter jurisdiction. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) ("In reviewing a factual challenge [to subject-matter jurisdiction], the court may look beyond the pleadings and view any evidence submitted to determine if subject matter jurisdiction exists.").

Abudayyeh worked as a PSA for Envoy, a regional commercial airline, at Chicago's O'Hare International Airport. (Compl. ¶¶ 5–6, 11, Dkt. No. 1-1.) She worked for Envoy from July 2000 through February 2017, and again from June 2017 through September 2017. (*Id.* ¶ 11.) On November 25, 2015, the National Mediation Board certified the Communications Workers of America, AFL-CIO ("Union") as the duly designated and authorized representative of Envoy's PSAs. (Compl. ¶ 25; Clemens Decl. ¶ 2, Dkt. No. 16.) Shortly thereafter, the Union and Envoy began negotiating an initial collective bargaining agreement. (Clemens Decl. ¶ 3.)

During their negotiations, Envoy and the Union entered into two interim agreements. First, on June 29, 2016, the two adopted an interim grievance procedure ("IGP") for Envoy employees. (Clemens Decl. ¶ 4, Clemens Decl., Ex. 1, Dkt. No. 16-1.) Then, on April 26, 2017, Envoy and the Union entered into an interim agreement ("Interim Agreement") setting rates of pay for PSAs and adopting four other, separate agreements concerning the purpose of the Interim Agreement, discipline and discharge, grievance procedures, and the establishment of the Envoy System Board of Adjustment. (Clemens Decl. ¶¶ 5–7, Clemens Decl., Ex. 2, Dkt. No. 16-2.) Finally, on August 15, 2019, Envoy and the Union executed their final collective bargaining agreement ("Final Agreement") governing the terms and conditions of employment for Envoy's PSAs. (Compl. ¶ 27; Clemens Decl. ¶ 9; Clemens Decl., Ex. 4, Dkt. No. 16-4.) The Final Agreement incorporated a letter of agreement titled "Arbitration and Waiver of Certain Claims" requiring that disputes

arising from the Final Agreement be resolved by the grievance and arbitration procedures set out there. (Compl. ¶ 26; Clemens Decl. ¶ 8; Clemens Decl., Ex. 3, Dkt. No. 16-3.)

Beginning in late 2015, Envoy implemented a biometric attendance-tracking system for its employees.[1] (Compl. ¶ 12.) In connection with its attendance-tracking system, Envoy required its employees to scan their fingerprints (and later, their handprints), which were collected and stored. (*Id.* ¶¶ 12–14.) For each workday, Envoy employees would clock in and clock out by placing their fingers or hands on a panel that would scan and verify their identities based on their biometric identifiers. (*Id.* ¶¶ 18–19.)

According to Abudayyeh, Envoy's collection and storage of Envoy employees' biometric information did not comply with the requirements of Illinois's BIPA. (*Id.* ¶ 4.) The BIPA is an informed consent statute enacted to protect individuals' privacy and control of their biometric identifiers and information. (*Id.* ¶ 3.) Abudayyeh claims Envoy violated the BIPA by not developing a publicly available retention schedule and guidelines for permanently destroying employees' biometric information; failing to inform Abudayyeh or its other employees in writing that their biometric information was being collected; failing to inform Abudayyeh or its other employees of the purpose and length of time for which their biometric information was being collected, stored, and used; and not obtaining prior written authorization from Abudayyeh or its other employees before collecting their biometric data. (*Id.* ¶¶ 4, 15–17, 20–24.) Consequently, Abudayyeh has sued Envoy on behalf of herself and a class of similarly situated Illinois Envoy

---

[1] Neither the complaint nor Envoy's declaration are clear as to whether the biometric attendance-tracking system was implemented before or after the Union's certification. At one point, the complaint vaguely states that the system was used "[t]hroughout the past five years." (Compl. ¶ 12.) That the class period begins on December 23, 2015, suggests the system was implemented on that date. (*Id.* ¶ 32.) On the other hand, Envoy's declaration states that it has been using biometric timekeeping technology "[s]ince November 25, 2015," when the Union was certified as the representative of Envoy's PSAs. (Clemens Decl. ¶ 10.)

3

employees who had their biometric information collected or captured between December 23, 2015 and July 18, 2019. (*Id.* ¶ 32.)

## DISCUSSION

Envoy contends that the complaint must be dismissed for lack of subject-matter jurisdiction because Abudayyeh's BIPA claims amount to a minor dispute subject to mandatory and exclusive arbitration under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.* Alternatively, Envoy argues that the BIPA claims are preempted by the Airline Deregulation Act of 1978 ("ADA"), 49 U.S.C. § 41713, and therefore must be dismissed for failure to state a claim. The Court begins, as it must, by determining whether it has jurisdiction over the action.

### I.    Jurisdiction

Under Rule 12(b)(1), a party may make either a factual or facial challenge to subject-matter jurisdiction. *Silha*, 807 F.3d at 173. A facial challenge requires "only that the court look to the complaint and see if the plaintiff has sufficiently ***alleged*** a basis of subject[-]matter jurisdiction." *Apex Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). By contrast, "a factual challenge lies where the complaint is formally sufficient but the contention is that there is ***in fact*** no subject matter jurisdiction." *Id.* at 444 (internal quotation marks omitted). Where, as here, a defendant mounts a factual challenge, "the court may look beyond the pleadings and view any evidence submitted to determine if subject[-]matter jurisdiction exists." *Silha*, 807 F.3d at 173. Ultimately, the proponent of jurisdiction bears the burden of proving by a preponderance of the evidence that jurisdiction exists. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 237 (7th Cir. 1995). To challenge subject-matter jurisdiction, Envoy has introduced a declaration and exhibits to show that there were agreements governed by the RLA in place before the Final Agreement. It argues that because Abudayyeh's BIPA claims cannot be resolved without

either applying or interpreting those agreements, the claims are subject to mandatory and exclusive arbitration under the RLA.

Congress passed the RLA with the purpose of promoting stability in labor-management relations in the rail and airline industries by "providing a comprehensive framework for resolving labor disputes." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 248, 252 (1994). To that end, "the RLA establishes a mandatory arbitral mechanism for 'the prompt and orderly settlement' of two classes of disputes." *Id.* at 252 (quoting 45 U.S.C. § 151a). The Supreme Court supplied the labels "major disputes" and "minor disputes" to distinguish the two classes of disputes. *Brotherhood of Ry., Airline & S.S. Clerks v. Atchison, Topeka & Santa Fe Ry. Co.*, 847 F.2d 403, 405 (7th Cir. 1988). Major disputes are those that "arise[] from the creation of new contracts or modifications of existing contracts that affect any of the mandatory subjects of bargaining established in the RLA." *BLET GCA UP v. Union Pac. R.R. Co.*, 988 F.3d 409, 412 (7th Cir. 2021). By contrast, minor disputes "arise from the interpretation or application of existing agreements." *Id.* "Thus, 'major disputes seek to create contractual rights, minor disputes to enforce them.'" *Hawaiian Airlines*, 512 U.S. at 253 (quoting *Consol. Rail Corp. v. Ry. Lab. Execs.' Ass'n* ("*Conrail*"), 491 U.S. 299, 302 (1989)).

If a dispute is a minor dispute, "it must be resolved only through the RLA mechanisms, including the carrier's internal dispute-resolution processes and an adjustment board established by the employer and the unions." *Id.* "The distinguishing feature of a minor dispute is that the dispute may be conclusively resolved by interpreting the existing [collective bargaining agreement]." *Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 583 (7th Cir. 1999) (internal quotation marks omitted). Consequently, even if a plaintiff's claim "is grounded upon rights which stem from some source other than the [collective bargaining agreement] (such as state law),

the claim will be preempted if it cannot be adjudicated without interpreting the [collective bargaining agreement], or if it can be conclusively resolved by interpreting [the collective bargaining agreement]." *Brown v. Ill. Cent. R.R. Co.*, 254 F.3d 654, 658 (7th Cir. 2001) (internal quotation marks omitted). A state-law claim that constitutes a minor dispute is preempted by the RLA's mandatory arbitral mechanism. *Coker*, 165 F.3d at 583. "Given the RLA's strong preference for arbitration, [an airline] bears a 'relatively light burden' in persuading the court that its action is pursuant to existing contractual authority and thus a minor dispute under the RLA." *BLET GCPA UP*, 988 F.3d at 413 (quoting *Conrail*, 491 U.S. at 307). So long as the airline's argument is "neither obviously insubstantial or frivolous, nor made in bad faith, the court lacks jurisdiction to do anything but dismiss the case and allow arbitration to go forward." *Id.* (internal quotation marks omitted).

Here, Envoy contends that *Miller v. Southwest Airlines Co.*, 926 F.3d 898 (7th Cir. 2019), is controlling authority holding that BIPA claims brought by unionized airlines employees are minor disputes subject to mandatory arbitration under the RLA. Like the present case, *Miller* involved airline employees' BIPA claims arising from their employers' maintenance of a biometric attendance-tracking system. The employers responded that the plaintiffs' unions consented to and received notice of the employers' attendance-tracking system on behalf of the plaintiffs, either expressly or through a provision in the operative collective bargaining agreements. *Id.* at 901. In considering the preemption issue, the Seventh Circuit first noted that the BIPA "provides that a worker *or an authorized agent* may receive necessary notices and consent to the collection of biometric information." *Id.* at 903 (citing 740 ILCS 14/15(b)). It then found that the plaintiffs' unions constituted authorized agents under the statute. Further, the Seventh Circuit noted that "how workers clock in and out is a . . . mandatory subject of bargaining." *Id.*

Thus, the question of whether the unions did in fact consent to the collection and use of the plaintiffs' biometric data or grant authority in the collective bargaining agreement is a question for an adjustment board. *Id.* at 903–04. Indeed, the Seventh Circuit stated that the dispute must be heard by an adjustment board because "[i]t is not possible even in principle to litigate a dispute about how an air carrier acquires and uses fingerprint information for its whole workforce without asking whether the union has consented on the employees' collective behalf." *Id.* at 904. The same is true as to issues arising out of the retention and destruction schedules for biometric data. *Id.* at 903–04. Following *Miller*, district courts within the Seventh Circuit "have consistently found that BIPA claims from unionized employees are preempted by federal labor law." *Roberson v. Maestro Consulting Servs. LLC*, No. 20-CV-00895-NJR, 2020 WL 7342693, at *9 (S.D. Ill. Dec. 14, 2020) (collecting cases).[2]

Abudayyeh argues that *Miller* does not apply here. She contends that her BIPA claims predate the Final Agreement and thus there cannot be preemption under the RLA when there is no collective bargaining agreement to rely upon or interpret.[3] In response, Envoy argues that even before the Final Agreement took effect, there were other forms of collectively bargained agreements between Envoy and the Union governing the terms and conditions of Envoy's relationship with its PSAs. First, following the Union's certification, Envoy argues that there were

---

[2] Many post-*Miller* cases address whether *Miller*'s preemption analysis also extends to preemption under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, given that § 301's preemption standard is "virtually identical" to the RLA's standard. *E.g.*, *Darty v. Columbia Rehab. & Nursing Ctr., LLC*, 468 F. Supp. 3d 992, 995 (N.D. Ill. 2020).

[3] Abudayyeh also claims that the RLA does not apply to her as a former employee. As she acknowledges, however, an adjustment board has jurisdiction over claims by former employees arising from the employment relationship and requiring the interpretation of the collective bargaining agreement. *Pennsylvania R.R. Co. v. Day*, 360 U.S. 548, 551–52 (1959). There is no question that Abudayyeh's BIPA claims arise from her employment relationship with Envoy. Consequently, if the Court concludes that the claims also depend upon the interpretation of agreements between Envoy and the Union, then the RLA will apply to Abudayyeh's claims.

certain implied agreements between Envoy and the Union concerning the biometric attendance-tracking system. Then, on June 29, 2016, Envoy and the Union entered into the IGP, a written agreement that established an interim grievance procedure for Envoy's employees. Finally, on April 26, 2017, Envoy and the Union entered into the Interim Agreement. Because each of those agreements must be interpreted in connection with Abudayyeh's BIPA claims, Envoy asserts that her claims are preempted by the RLA. Accordingly, the Court's analysis will consider each of the three provisional agreements separately and determine as to each agreement whether it gives rise to RLA preemption. If so, any of Abudayyeh's BIPA claims arising during the period that the particular agreement was in effect will be preempted.

### A. Interim Agreement

The Interim Agreement was the last provisional agreement before the Union and Envoy reached the Final Agreement. Envoy contends that despite its interim status, the Interim Agreement still constituted a collective bargaining agreement and that any of Abudayyeh's BIPA claims arising after the effective date of the Interim Agreement are preempted because their resolution requires its interpretation.

As an initial matter, the Court finds that a formal or final collective bargaining agreement is not a prerequisite to a finding of a minor dispute requiring arbitration. The test for whether a dispute is a minor dispute "is whether the conflict can be resolved by reference to an ***existing*** agreement." *Atchison, Topeka & Santa Fe Ry. Co. v. United Transp. Union*, 734 F.2d 317, 321 (7th Cir. 1984) (emphasis added). And an agreement's interim status does not preclude it from giving rise to a minor dispute, so long as it is nonetheless a collectively bargained agreement. *See, e.g.*, *Fairbairn v. United Air Lines, Inc.*, 250 F.3d 237, 241 (4th Cir. 2001) ("[T]he RLA does not apply to ***all*** agreements involving rates of pay, rules, or working conditions, but only to collective

bargaining agreements."); *Sierra v. Cont'l Airlines, Inc.*, No. 2:12-cv-4368(DMC)(MF), 2013 WL 1222797, at \*2–3 (N.D. Ill. Mar. 25, 2013) (holding that the plaintiff's wrongful discharge claim was a minor dispute where it required interpretation of an interim agreement entered into pending negotiation of a final collective bargaining agreement). Here, the Interim Agreement states that it was "collectively bargained between [Envoy and the Union]" and "made and entered in accordance with the provisions of the" RLA. (Clemens Decl., Ex. 2.) Similar language has been found to evidence the existence of a collective bargaining agreement for purposes of the RLA. *See, e.g.*, *Pyles v. United Air Lines, Inc.*, 79 F.3d 1046, 1050 (11th Cir. 1996) (finding that an interpretation of a letter agreement indicating that it was "entered into in accordance with the provisions of the [RLA]" interpreted a portion of the collective bargaining agreement).

While Abudayyeh does not contest that the Interim Agreement is an agreement governed by the RLA, she claims that no provision in the Interim Agreement evidences the Union's consent to the collection of PSAs' biometric information or waives the disclosures required by the BIPA. But the Interim Agreement does contain a provision stating that its provisions "shall control over any Federal, State or Local statute, law, regulation, ordinance, or other governing provision . . . to the extent such Laws permit a waiver, exception or other treatment for employees covered under a collective bargaining agreement." (Clemens Decl., Ex. 2.) Given that BIPA is an Illinois state law, it is at least arguable that a straightforward application of that provision would resolve Abudayyeh's claims.

In response, Abudayyeh contends that the BIPA does not permit waiver of its mandates. Abudayyeh, however, reads the contractual language in the Interim Agreement very narrowly and ignores that the provision applies to the extent state law permits waiver *or* other treatment for employees covered by a collective bargaining agreement. Relatedly, Abudayyeh points to

language in that provision requiring Envoy to "maintain a list of all Laws subject to this provision" and notes that BIPA is not included among the listed statutes. (*Id.*) But the Interim Agreement expressly indicates that the list is not exhaustive, as it states that the covered statutes "shall include but are not limited to" those listed. (*Id.*) At most, Abudayyeh demonstrates only that the relevant language is subject to interpretation, not that Envoy's argument is insubstantial or frivolous. Because Envoy can point to an arguable contractual basis for the Union's consent to the collection of PSAs' biometric information, the Court's inquiry must end—it is not to consider the merits of the underlying dispute. *Chi. & N. W. Transp. Co. v. Ry. Lab. Execs. Ass'n*, 855 F.2d 1277, 283 (7th Cir. 1988) ("[The court's] role is limited to determining whether the dispute can be characterized as involving the proper application or meaning of a contract provision.").

Next, Abudayyeh contends that the Interim Agreement does not actually provide her with an arbitral forum. Although the Interim Agreement contains sections setting out a grievance procedure and creating an adjustment board, it states that both are "limited exclusively to grievances involving suspensions and/or terminations." (Clemens Decl., Ex. 2.) And because her BIPA claims do not involve suspension or termination, Abudayyeh argues that she cannot be compelled to arbitrate them since arbitration is a matter of contract. Yet Abudayyeh's assertion that parties are bound to arbitrate only those disputes that they have agreed to arbitrate under the collective bargaining agreement applies only to agreements governed by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. "The LMRA, *unlike the RLA*, does not mandate arbitration, nor does it prescribe the types of disputes to be submitted to arbitration under bargaining agreements." *Hawaiian Airlines*, 512 U.S. at 263 n.9 (emphasis added). By contrast, the RLA's procedures are mandatory for all minor disputes. *Andrews v. Louisville & Nashville R.R. Co.*, 406 U.S. 320, 322 (1972). "[T]he possibility that a contractual provision might be used

to deny [an employee] access to the congressionally mandated process is insufficient to qualify [the employee] for an exception to the general rule barring RLA-preempted suits from the courts." *Capraro v. United Parcel Serv. Co.*, 993 F.2d 328, 336 (3d Cir. 1993); *see also Slagley v. Ill. Cent. R.R. Co.*, 397 F.2d 546, 551 (7th Cir. 1968) (explaining that the rights afforded to employees under the RLA "are statutory and cannot be nullified by agreement between the carrier and the union"), *overruled on other grounds by Orphan v. Furnco Constr. Corp.*, 466 F.2d 795, 803 n.20 (7th Cir. 1972); *Indep. Ass'n of Cont'l Pilots v. Cont'l Airlines*, No. CIV. A. 96-389-SLR, 1997 WL 309438, at *4 (D. Del. Apr. 29, 1997) ("In cases falling under the RLA . . . the duty to arbitrate certain issues, *i.e.*, all minor disputes, stems not from a contract but from the RLA itself."), *aff'd* 155 F.3d 685 (3d Cir. 1998). Thus, to the extent any provision in the Interim Agreement purports to deny Envoy PSAs a forum for grieving and arbitrating a minor dispute not involving suspension or termination, that provision is invalid and unenforceable. *Capraro*, 993 F.2d at 336.[4]

Because the resolution of Abudayyeh's BIPA claims arising after the April 26, 2017 execution of the Interim Agreement require an interpretation or application of that agreement, those claims are minor disputes subject to the RLA's mandatory arbitral mechanism. For that reason, any claims for BIPA violations post-dating the Interim Agreement are dismissed for lack of subject-matter jurisdiction.

---

[4] Even if Envoy attempted to deny Abudayyeh access to the grievance and arbitration procedures based on the Interim Agreement's limiting language, she would not necessarily have been left remediless. Rather, she could have sought a judicial order compelling arbitration. *Capraro*, 993 F.2d at 336–37. At minimum, Abudayyeh "was obligated to 'at least ***attempt*** to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement.'" *Santiago v. United Air Lines, Inc.*, 77 F. Supp. 3d 694, 703 (N.D. Ill. 2014) (quoting *Vaca v. Sipes*, 386 U.S. 171, 184 (1967)).

### B.     IGP

Prior to the execution of the Interim Agreement, Envoy and the Union agreed to the IGP, which put in place a temporary grievance procedure, effective June 29, 2016, to apply during the pendency of negotiations of the final collective bargaining agreement. Like the Interim Agreement, the IGP explicitly states that it was "made and entered into in accordance with the provision[s] of the" RLA. (Clemens Decl., Ex. 1.) Therefore, Envoy argues that any BIPA claims arising after the IGP's effective date are preempted because resolution of those claims require the interpretation or application of the IGP.

In response, Abudayyeh first notes that the IGP, like the Interim Agreement, appears to allow PSAs to grieve only issues concerning discipline, discharge, and compensation. Specifically, the IGP prescribes two different procedural routes for grievances "concerning discipline, discharge or issues affecting an employee's compensation" and grievances involving a suspension or termination. (*Id.*) However, while the IGP does not speak to how grievances concerning other minor disputes should be handled, nothing in it expressly limits PSAs' ability to submit grievances unrelated to discipline, discharge, or compensation issues. *Cf. Crooms v. Sw. Airlines Co.*, 459 F. Supp. 3d 1041, 1054 (N.D. Ill. 2020) ("A request for arbitration 'should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83 (1960))). Further, as discussed above, the RLA does not allow an employer to contractually limit its employees' ability to grieve minor disputes.

Abudayyeh also argues that the IGP does not provide for the resolution of grievances before an adjustment board and therefore provides PSAs with no arbitral forum to resolve

disputes. While the RLA provides for a permanent national adjustment board to hear disputes in the rail industry, it did not immediately provide for a similar permanent adjustment board in the airline industry (and no such board has since been established). 45 U.S.C. § 184; *Int'l Ass'n of Machinists, AFL-CIO v. Cent. Airlines, Inc.*, 372 U.S. 682, 685–88 (1963). Instead, the RLA imposed upon airlines and the unions representing airline employees a "statutory duty of establishing and utilizing system, group, or regional boards of adjustment for the purpose of adjusting and deciding disputes arising under existing contracts." *Cent. Airlines*, 372 U.S. at 686. At the same time, the RLA does not indicate when that duty is triggered. *Air Line Pilots Ass'n Int'l v. Jetstream Int'l Airlines, Inc.*, 716 F. Supp. 203, 205 (D. Md. 1989). One court addressed that question and found that "implicit in the statutory structure and judicial interpretations of the RLA is the recognition that an initial collective bargaining agreement is a prerequisite to the parties' duty to create a system board of adjustment." *Id.* at 207. That is because the collective bargaining agreement is the source of "the rules, practices, and understandings to which a court or system board can look thereafter to adjudicate the grievances brought by the parties." *Id.*

Of course, the Court has deemed the IGP to be a collectively bargained agreement even though it was intended only as an interim procedure during the pendency of negotiations culminating in the Final Agreement. Thus, it is not clear whether Envoy and the Union's agreement to this interim procedure gave rise to an attendant duty to create an adjustment board. But there is no need to decide this issue because Abudayyeh does not claim that she ever attempted to avail herself of the IGP, and therefore the consequence of the temporary unavailability of a system board is merely conjectural. *See Republic Steel Corp. v. Maddox*, 379 U.S. 650, 653 (1965) ("[I]t cannot be said in the normal situation, that contract grievance

procedures are inadequate to protect the interests of an aggrieved employee until the employee has attempted to implement the procedures and found them so.").

Finally, Abudayyeh emphasizes that although the IGP puts in place a grievance procedure, it otherwise contains no terms concerning the rates of pay, rules, or working conditions for Envoy PSAs. Thus, she asserts that her BIPA claims do not constitute a minor dispute because there are no provisions of the IGP that must be interpreted in connection with those claims. But it is not necessary that the IGP "explicitly address the dispute in issue because a collective bargaining agreement embodies terms not necessarily express but nonetheless included by implication." *Burlington N. R.R. Co. v. United Transp. Union*, 862 F.2d 1266, 1273 (7th Cir. 1988). In particular, the collective bargaining agreement is interpreted "to include those established past practices that form the course of dealing between the parties." *Brotherhood of Ry., Airline & S.S. Clerks*, 847 F.2d at 406; *see also BLET GCA UP*, 988 F.3d at 413 ("[A]ny well established practices that constitute a course of dealing between the carrier and employees form part of the agreement the same as do any specific terms set out in the text of the agreement." (internal quotation marks omitted)). For that reason, this Court "cannot end its inquiry with the determination that the [IGP] is silent" on issues concerning PSAs' biometric information; "it must consider whether past practice" gave Envoy an arguable basis to claim that the IGP impliedly authorized its biometric attendance-tracking system. *Soo Line R.R. Co. v. Brotherhood of Locomotive Eng'rs*, 74 F. Supp. 3d 902, 907 (N.D. Ill. 2014).

A past practice can be established by showing that the practice occurred "for a sufficient period of time" with the knowledge and acceptance of the employees and the union. *Brotherhood of Locomotive Eng'rs v. Boston & Maine Corp.*, 788 F.2d 794, 798 (1st Cir. 1986). Here, Envoy contends that its biometric attendance-tracking system was in place at all times (or nearly all

times) after the Union's certification. (Clemens Decl. ¶ 10.) At no point did the Union ever object to or file a grievance regarding the attendance-tracking system. (*Id.* ¶ 12.) Thus, Envoy has at least an arguable basis for its claim that the IGP contained an implied agreement concerning Envoy's collection of PSAs biometric information. The basis for finding implied agreement stemming from the IGP is reinforced by the fact that the IGP sets out a grievance procedure without also enumerating terms and conditions of the PSAs' employment. Yet, when there is a collective bargaining agreement in place, the term "grievance" is regarded to mean "merely a claim of breach of the collective bargaining agreement." *Int'l Ass'n of Machinists & Aerospace Workers, Progressive Lodge No. 1000 v. Gen. Elec. Co.*, 865 F.2d 902, 905 (7th Cir. 1989); *see also Hawaiian Airlines*, 512 U.S. at 255 ("[W]e believe that the most natural reading of the term 'grievances' in [the RLA] context is as a synonym for disputes involving the application or interpretation of a [collective bargaining agreement]."). The IGP necessarily must include some implied agreements—otherwise PSAs would have no source of rights to vindicate through the grievance procedure. *Cf. Warrior & Gulf Navigation Co.*, 363 U.S. at 581 ("The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement."). And Envoy has a non-frivolous argument that one of those implied agreements concerns the collection and use of PSAs biometric information— whether there was in fact an enforceable contractual obligation is a matter for an arbitrator rather than this Court. *See Miller*, 926 F.3d at 904 ("What [the employer] told the union, whether it furnished that information in writing, when these things happened, and what the union said or did in response, are matters not in this record. They are ***properly*** not in this record, as they are topics for resolution by an adjustment board rather than a judge."); *Brotherhood of Ry., Airline & S.S. Clerks*, 847 F.2d at 408 (finding a minor dispute where the evidence supported a nonfrivolous

15

claim that the employer's conduct was consistent "with a mutually understood course of dealing between" the employer and the union but noting that "whether the evidence is sufficient to establish an enforceable, contractual obligation is a question solely for" the adjustment board).

In short, Envoy has an arguable basis to claim that the IGP impliedly authorized its collection of PSAs' biometric information. Therefore, Abudayyeh's BIPA claims arising after the June 29, 2016 adoption of the IGP are dismissed.

### C.      Pre-IGP Implied Agreement

Finally, there was a period following the Union's certification and before the effective date of the IGP when there was no written collectively bargained agreement in place. Envoy claims that, even absent an express agreement, Abudayyeh's BIPA claims from this period are preempted by Envoy and the Union's implied agreement stemming from the Union's knowledge and acceptance of the biometric attendance-tracking system.

As discussed above, implied agreements based on past practice unquestionably may be considered in interpreting an existing collective bargaining agreement. However, the issue here is whether those implied agreements can preempt claims that arise before the union and the employer reach any initial, express collectively bargained agreement. Both the Supreme Court and the Seventh Circuit have used language indicating that an ***existing*** collective bargaining agreement is a prerequisite to a dispute's classification as a minor dispute. *See, e.g.*, *Conrail*, 491 U.S. at 305 ("The distinguishing feature of [a minor dispute] is that the dispute may be conclusively resolved by interpreting the existing agreement."); *BLET GCA UP*, 988 F.3d at 412 ("Minor disputes . . . arise from the interpretation or application of existing agreements."); *Burlington N. R.R. Co.*, 862 F.2d at 1271 ("While the interpretation or application of the agreement may be questioned in a minor dispute, existence of a collective bargaining agreement is

16

unquestioned."). Yet the Third Circuit recognized that "[s]ome courts have mentioned in dicta the existence of a formal collective bargaining agreement as a prerequisite to the Adjustment Board's jurisdiction" but claimed that the dicta should be read with caution because "[w]hat is considered an 'agreement' for purposes of invoking the jurisdiction of an Adjustment Board has not received extensive analysis." *McQuestion v. N.J. Transit Rail Operations, Inc.*, 30 F.3d 388, 392 (3d Cir. 1994). Ultimately, the Third Circuit concluded in *McQuestion* that an adjustment board had jurisdiction over an "implied-in-fact" agreement between the union and the employer as to "certain aspects of the employment relationship" even though, at the time, there was no operative collective bargaining agreement governing that relationship. *Id.* at 396–97.

The Court finds important factual differences that make *McQuestion* inapposite to the present circumstances. In *McQuestion*, the dispute arose after an earlier collective bargaining agreement with a predecessor union expired, when the employer had implemented a proposed but unratified collective bargaining agreement as the "operating guide for regulating" the plaintiffs' employment. *Id.* at 395. Although the union newly certified as the plaintiffs' representative had not ratified the proposed agreement, both the employer and the union put its grievance provisions into effect and those "provisions formed the basis for the employment relationship between" them. *Id.* at 396. Further, nothing in the record before the Third Circuit indicated that the provisions relevant to the dispute before it differed from those in the expired collective bargaining agreement. *Id.* Thus, even though the agreement had not been ratified by the union, there were nonetheless certain definite terms of the agreement that the employer implemented, and the facts indicated the union not only acquiesced in implementing and enforcing those terms but was to some extent an active participant. *See id.* at 396–97. Viewing the employer's history of collective bargaining together with the union's conduct informed the Third Circuit's conclusion that there

was an implied-in-fact collective bargaining agreement as to certain terms of the employment relationship, notwithstanding the union's earlier rejection of a formal collective bargaining agreement.

While the Third Circuit's decision is not binding on this Court, at least certain aspects of its rationale find support in Seventh Circuit precedent.[5] For example, the Seventh Circuit has recognized that "there is no general requirement that a collective bargaining agreement . . . be in writing." *Chi. & N. W. Transp. Co. v. Ry. Lab. Execs. Ass'n*, 908 F.2d 144, 156 (7th Cir. 1990); *see also Merk v. Jewel Food Stores Div. of Jewel Cos., Inc.*, 945 F.2d 889, 895 (7th Cir. 1991) ("[A] collective bargaining agreement may be partly or wholly oral as well as partly or wholly in writing, and a written collective bargaining agreement may be orally modified."). Rather, "[a]ll that is required is conduct manifesting an intention to abide and be bound by certain terms." *Atchley v. Heritage Cable Vision Assocs.*, 101 F.3d 495, 500 n.2 (7th Cir. 1996). But prior to the effective date of the IGP, the Court does not find any conduct on the Union's part suggesting that it entered into an agreement on behalf of its members regarding the attendance-tracking system. Envoy simply alleges that the attendance-tracking system was in place for most or all of the time following the Union's certification as the PSAs' representative and the Union never objected to it. However, the Union's silence, standing alone, is insufficient when untethered to any express agreement signaling the beginning of a collective-bargaining relationship. "As a practical matter, no significant relationship between the parties exists until the union and the employer arrive at their first collective bargaining agreement." *Jetstream Int'l*, 716 F. Supp. at 207. Before Envoy and the Union arrived at their first express agreement—the IGP—the parties had a duty "to exert

---

[5] Notably, one member of the *McQuestion* panel disagreed that there was an enforceable implied collective bargaining agreement governed by the RLA. *McQuestion*, 30 F.3d at 398 (Nygaard, J., concurring and dissenting) ("The majority's conclusion that such a *de facto* agreement comes within the [RLA] is unsupported by any authority.").

every reasonable effort to make and maintain agreements concerning" mandatory subjects of bargaining, 45 U.S.C. § 152, First, but the RLA did not "undertake to compel agreement" between them. *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 548 (1937). Especially given the lack of prior history between Envoy and the Union, the Court cannot find an implied agreement based on the Union's silence as to any particular working condition.

To understand why agreements cannot be implied prior to some initial and express collectively bargained agreement, it is instructive to look at the status quo provisions applicable to major disputes—*i.e.*, those pertaining to the creation of new agreements affecting mandatory terms of bargaining or modifications to existing ones. *See* 45 U.S.C. §§ 152, Seventh, 155, First, 156, 160. "The purpose of the RLA's status quo requirement is to maintain the parties' respective positions while they negotiate future rights." *Atlas Air, Inc. v. Int'l Brotherhood of Teamsters*, 928 F.3d 1102, 1109 (D.C. Cir. 2019). Accordingly, when a major dispute arises, the status quo provisions require the parties to "preserve and maintain unchanged those actual, objective working conditions and practices . . . which were in effect prior to the time the pending dispute arose." *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*, 396 U.S. 142, 152–53 (1969). This obligation to preserve the status quo applies even to those working conditions that were not covered in an existing agreement. *Id.* While the dispute is working its way through the RLA's major dispute resolution procedures, "neither party may unilaterally alter the status quo." *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378 (1969).[6]

---

[6] "The district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures." *Conrail*, 491 U.S. at 303. But "the mere fact that a major dispute is occurring and has triggered the obligation to maintain the status quo does not, without more, extend the court's jurisdiction to unrelated minor disputes." *U.S. Airlines Pilots Ass'n ex rel. Cleary v. US Airways, Inc.*, 859 F. Supp. 2d 283, 301 (E.D.N.Y. 2012).

Yet the Supreme Court has held that nothing prevents the employer from unilaterally altering the status quo in circumstances where negotiation of a collective bargaining agreement is ongoing and no collective bargaining agreement is or previously was in effect. *Williams v. Jacksonville Terminal Co.*, 315 U.S. 386, 402–03 (1942); *see also Int'l Brotherhood of Teamsters v. N. Am. Airlines*, 518 F.3d 1052, 1061 (9th Cir. 2008) ("[W]e hold that the RLA does not preclude the parties from unilaterally changing working conditions before a collective bargaining agreement has been formed, even if negotiations have commenced."); *Atlas Air, Inc. v. Air Line Pilots Ass'n*, 232 F.3d 218, 223 (D.C. Cir. 2000) ("By their express terms, these so-called 'status quo' provisions of the [RLA] only prohibit unilateral changes in wages or working conditions where there is a preexisting collective bargaining agreement."). The Supreme Court has explained that the RLA's status quo provisions "are aimed at preventing changes in conditions previously fixed by collective bargaining agreements" because "[a]rrangements made after collective bargaining obviously are entitled to a higher degree of permanency and continuity than those made by the carrier for its own convenience and purpose." *Williams*, 315 U.S. at 403.

Therefore, here, Envoy retained the unilateral authority to change working conditions (such as attendance-tracking methods) during the period following the Union's certification and preceding the effective date of the IGP.[7] Given Envoy's unilateral authority to implement or

---

[7] The Eleventh Circuit has concluded that *Williams* was circumscribed by the Supreme Court's subsequent decision in *Detroit & Toledo*, 396 U.S. 142, and has found that the RLA "precludes unilateral changes after negotiations have commenced." *Int'l Ass'n of Machinists & Aerospace Workers v. Transportes Aereos Mercantiles Pan Americandos, S.A.*, 924 F.2d 1005, 1008 (11th Cir. 1991). Specifically, it found that "*Detroit & Toledo*[] has limited *Williams*' allowance of unilateral changes to the narrow situation where there is 'absolutely no prior history of any collective bargaining *or* agreement between the parties on any matter.'" *Id.* (quoting *Detroit & Toledo*, 396 U.S. at 158). The Ninth Circuit has disagreed with the Eleventh Circuit, however, noting that *Detroit & Toledo* "did not even address the applicability of a status quo provision in the period before a collective bargaining agreement has been completed, and so it in no way modified *Williams*'s ruling that a carrier can 'exercise its authority to arrange its business relations with its employees' during the time frame before an initial collective bargaining agreement has been completed." *N. Am. Airlines*, 518 F.3d at 1060 (quoting *Williams*, 315 U.S. at 402). But even if the Eleventh Circuit has the better argument, it would not change this Court's conclusion here because Envoy

maintain the attendance-tracking system during this period, the Union's silence, standing alone, is not probative of the Union making any form of agreement with respect to that system. And the Court cannot classify a dispute as a minor dispute without an agreement to interpret. *Reg'l Airline Pilots Ass'n v. West Wings Airlines, Inc.*, 915 F.2d 1399, 1401 (9th Cir. 1990). Consequently, Abudayyeh's BIPA claims arising prior to the effective date of the IGP are not preempted and the Court may exercise jurisdiction over them.

## II.     ADA Preemption

Having found that it has jurisdiction over some of Abudayyeh's BIPA claims, the Court proceeds to address whether those remaining claims must nonetheless be dismissed as preempted by the ADA.

Envoy's ADA preemption argument arises under Rule 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

---

provides little information about its history of collective bargaining with the Union prior to the IGP. Moreover, in *Transportes Aereos Mercantiles*, that bargaining history included a tentative, but unratified, agreement with a predecessor union that the employer told the successor union represented the status quo. *Transportes Aereos Mercantiles*, 924 F.2d at 1006, 1009. Thus, the bargaining history was far more extensive there than the history depicted by the facts here.

Congress enacted the ADA "to promote 'efficiency, innovation, and low prices' in the airline industry through 'maximum reliance on competitive market forces and on actual and potential competition.'" *Nw., Inc. v. Ginsberg*, 572 U.S. 273, 280 (2014) (quoting 49 U.S.C. § 40101(a)(6), 12(A)). "To ensure that the States would not undo federal deregulation with regulation of their own, the ADA included a pre-emption provision." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992). That provision provides that "a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). While the Supreme Court has interpreted this preemption provision broadly, it has also noted that "some state actions may affect airline fares in too tenuous, remote, or peripheral a manner to have pre-emptive effect." *Morales*, 504 U.S. at 384, 390 (internal quotation marks and alterations omitted). The Seventh Circuit has concluded that the ADA preempts any state law that "'relates to' airline rates, routes, or services, either by expressly referring to them or by having a significant economic effect upon them." *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1432 (7th Cir. 1996).

According to Envoy, the ADA preempts Abudayyeh's BIPA claims because those claims implicate safe passenger transportation—the airline's most critical service. Specifically, Envoy asserts that the attendance-tracking system's use of employees' biometric information ensures that individuals clocking into work are in fact the persons that Envoy employs. While the Court does not doubt that Envoy's biometric attendance-tracking system has an ancillary security benefit, it is also quite clear that its primary purpose is to track the PSAs' attendance and hours. (*See, e.g.*, Compl. ¶ 12 ("Plaintiff, and all other members of the putative BIPA class, were required to have their fingerprints (and at times their handprint) collected and/or captured so that Defendant could store it and use it moving forward as a method of identification to record their hours of work.").)

In any case, some courts have questioned whether "safety" meets the Seventh Circuit's definition of "service" in the ADA context as "generally representing a bargained-for or anticipated provision of labor from one party to another leading to a concern with the contractual arrangement between the airline and the user of the service." *Hamilton v. United Airlines, Inc.*, 960 F. Supp. 2d 776, 785 (N.D. Ill. 2012) (alterations omitted) (quoting *Travel All Over the World*, 73 F.3d at 1433). That is because "safety is not an element over which airlines compete but is an implicit understanding that each airline undertakes to ferry its passengers safely to their chosen destination." *Id.*; *see also Bader v. United Airlines, Inc.*, 113 F. Supp. 3d 981, 989 (N.D. Ill. 2015) (same).

Assuming that safety is, in fact, a service for ADA purposes, Envoy would still need to establish that the BIPA's requirements have some economic impact on its ability to keep passengers safe to make a case for ADA preemption. *See Rogers v. BNSF Ry. Co.*, No. 19 CV 3083, 2019 WL 5635180, at *3 (N.D. Ill. Oct. 31, 2019) ("[The defendant] has not made a showing of any impact on its services (let alone a significant impact, assuming that is required); any such contention is highly speculative, to say the least.").[8] But Envoy has not made such a showing. Nor can the Court discern how the BIPA's requirements affect passenger security in anything more than a tenuous or remote manner. Envoy also cites several district court decisions finding ADA preemption of state-law claims based on violations of individuals' privacy in their personal information. *See, e.g.*, *In re Am. Airlines, Inc., Priv. Litig.*, 370 F. Supp. 2d 552, 562–65 (N.D. Tex. 2005); *In re Jetblue Airways Corp. Priv. Litig.*, 379 F. Supp. 2d 299, 315–16

---

[8] *Rogers* analyzes a substantially similar preemption provision in the Federal Aviation Administration Authorization Act, which provides that "a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 29 U.S.C. § 14501(c)(1). The Supreme Court has largely interpreted this preemption provision in accordance with its interpretation of the ADA's preemption provision. *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008).

(E.D.N.Y. 2005). It argues that since the BIPA claims in this case also relate to an airlines' management of personal information, the claims must similarly be preempted by the ADA. However, the cases cited by Envoy all relate to customers' personal information and implicate not passenger safety but the airlines' reservations and ticket sales services. *E.g.*, *In re Jetblue Airways Corp. Priv. Litig.*, 379 F. Supp. 2d at 315. The Court therefore finds Envoy's cited cases inapposite.

In short, the Court finds that Envoy's attendance-tracking system had, at most, a remote effect on Envoy's provision of safe air transportation. For that reason, the ADA does not preempt Abudayyeh's remaining BIPA claims.

## CONCLUSION

For the foregoing reasons, Envoy's motion to dismiss (Dkt. No. 14) is granted in part and denied in part. To the extent Abudayyeh's BIPA claims arise after the June 29, 2016 effective date of the IGP, those claims are dismissed for lack of subject-matter jurisdiction. However, Abudayyeh's BIPA claims predating the IGP may proceed.

ENTERED:

Dated:  August 3, 2021

_____

Andrea R. Wood
United States District Judge